***********
This matter was reviewed by the Full Commission on August 2, 2011, upon the appeal of Plaintiff from an Opinion and Award by Deputy Commissioner Kim Ledford filed on February 28, 2011. This case was heard by Deputy Commissioner Ledford on May 11, 2010 in Newton, North Carolina. The depositions of Dr. William Geideman and Dr. Allen Edwards are part of the evidence of record.
 ***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner.
 *********** EVIDENTIARY MATTERS
While this case was pending for decision before the Full Commission, Plaintiff filed two motions seeking to supplement the record with additional documentation pertaining to Defendants' payment of temporary total disability benefits beginning January 5, 2010 and additional medical records regarding Defendants' refusal to authorize certain medical treatment *Page 2 
in 2011. Plaintiff's motions are hereby DENIED. The records offered in the March 2, 2011 motion were not necessary for a determination of the issues pending before the Full Commission. With regard to the medical treatment Defendants have denied in 2011, those issues can be addressed through the filing of a medical motion if the parties cannot resolve these issues after receipt of this Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner in the Pretrial Agreement as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter.
2. The employer-employee relationship existed between Plaintiff and Defendant-Employer.
3. Sedgwick Claims Management Services was the compensation carrier on the risk.
4. There is no issue as to misjoinder or nonjoinder of parties.
5. The Employee's average weekly wage is $495.00, which generates a compensation rate of $330.02 per week, or will be determined from a Form 22 wage chart to be provided by Defendants. (NOTE: Defendants did not produce a Form 22 wage chart after the hearing.)
6. Plaintiff sustained an injury by accident arising out of and in the course of her employment with Defendant-Employer on or about October 29, 2008. *Page 3 
7. On March 25, 2010, Defendants sent Plaintiff a check in the amount of $2,713.48, which represented payment of temporary total disability benefits for the period from January 5, 2010 to March 22, 2010, albeit at an incorrect weekly compensation rate.
8. The parties stipulated that Dr. William Davis would be the authorized treating physician and that the surgery he performed was approved.
9. The Pre-Trial Agreement with attached documentation was marked and received as Stipulated Exhibit 1. The stipulated documents include the following: IC forms, discovery responses, medical records, personnel file records, Employment Security Commission payments, job search records, unpaid medical bills, and emails.
10. After the hearing before Deputy Commissioner Ledford, but before she filed her Opinion and Award, the parties also stipulated to the following:
 (a) November 19, 2008 Catawba Valley Medical Center ER Record;
 (b) Medical records from Dr. William Davis from April 2010, including operative report;
 (c) April and May 2010 reports from Corvel.
 ***********
Based upon the competent evidence adduced from the record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Defendant-Employer Manpower is a temporary employment agency that provides staffing services in a variety of fields, including light industrial, heavy industrial and clerical positions. *Page 4 
2. Plaintiff Kimberlyn Mayhorn, who was 54 years old at the time of the hearing before the Deputy Commissioner, had been employed by Defendant-Employer for approximately three months as of October 29, 2008. She had been assigned to work at BSN Medical as a packer, pulling medical supply orders. This was considered a light industrial position.
3. On October 29, 2008, Plaintiff sustained an injury by accident arising out of and in the course of her employment with Manpower when she stepped on a pallet and it broke, causing her to fall forward and twist to the left as her left foot went down into the pallet. Plaintiff developed swelling across her left foot and ankle and experienced immediate pain in her left ankle and kneecap.
4. Following the injury, Defendant-Employer directed Plaintiff to Hart Industrial Clinic, where she came under the care of Dr. Allen Edwards. Plaintiff was diagnosed with a sprain/strain of the medial collateral ligament in the left knee, sprain/strain of the left ankle, and sprain/strain of the tarsometatarsal joint and ligament, and was advised to limit her walking at work, with no squatting or climbing. Defendant-Employer concedes that there was no assignment for Plaintiff at BSN within these restrictions.
5. At the time of Plaintiff's injury, Defendant-Employer had a return-to-work program which involved placing injured employees at Family Care. Family Care is a thrift store that usually operates using the services of volunteers. If Defendant-Employer had an injured employee whose restrictions prevented him from returning to work in the position in which he was injured, Defendant-Employer would put the employee to work at the thrift store and pay that employee the same wages he was earning at the time of the injury. Family Care was usually able to find something for the employee to do within his restrictions. *Page 5 
6. Plaintiff treated with Dr. Edwards from October 29, 2008 through December 23, 2008. During that time Dr. Edwards continued to assign work restrictions which precluded Employee from returning to work at the BSN assignment. Defendant-Employer therefore asked Plaintiff to work at the thrift store. Plaintiff was supposed to work on November 7, 2008, but did not go in because she had an allergic reaction, including rash, related to medication prescribed by Dr. Edwards for treatment of the injury.
7. On November 10, 2008, Dr. Edwards gave Plaintiff crutches and assigned additional work restrictions. She was also supposed to keep her left foot elevated. Plaintiff reported to work on crutches at Family Care on November 12 and 13, 2008. Her job involved sorting through donations. She was given a chair with wheels to sit on, but found it difficult to roll across the rough concrete floor and keep her foot elevated.
8. Defendant-Employer continued to make work available for Plaintiff at Family Care, including at one point a clerical-type position that involved filing, but Plaintiff failed to report to work after November 13, 2008. When Plaintiff did not report to work, her husband usually called Defendant-Employer to advise why she would be out. The reasons given for Plaintiff's absenteeism included that she had the flu or was having too much foot pain.
9. When Plaintiff's husband called Defendant-Employer on December 1, 2008 to report that Plaintiff would not be coming to work that day, he was asked to have Plaintiff call. When Plaintiff called later that same day, she was told that her employment with Defendant-Employer was terminated because of attendance reasons and "no call/no show." As of the date Plaintiff was terminated, she could have returned to work at Family Care but could not have returned to work as a picker at BSN. *Page 6 
10. On December 23, 2008, Dr. Edwards continued Plaintiff's work restrictions of "minimal standing/walking assisted with crutch," and referred her to an orthopaedic specialist to investigate the cause of her continued complaints of pain.
11. On January 8, 2009, Plaintiff came under the care of Dr. William Geideman, a foot and ankle specialist at the Hickory Orthopaedic Center. On examination Dr. Geideman noted a positive Tinel sign over the superficial peroneal and posterior tibial nerves, a finding indicative of nerve irritation that would not show up on an MRI. Dr. Geideman's initial diagnosis was ankle sprain with alteration of gait pattern and weakness with secondary nerve irritation. He recommended physical therapy and restricted Plaintiff to sedentary work. By March 5, 2009, Plaintiff was reporting improved left foot pain, so Dr. Geideman increased her work duties to allow her to begin limited walking and standing. He also recommended continued physical therapy.
12. When Plaintiff returned to Dr. Geideman on April 2, 2009, she told him that Defendants had not approved the physical therapy he had recommended. This was based upon a records review by a doctor in California. Dr. Geideman decided to discharge Plaintiff from his care at that point, advising Defendants that perhaps the doctor in California should assume Plaintiff's care.
13. As of April 2, 2009, Plaintiff had not yet reached maximum medical improvement, and she remained restricted to work that involved only limited walking and standing.
14. When Plaintiff returned to Dr. Geideman on June 4, 2009, she was complaining of severe pain and sensitivity with diffuse swelling across the left foot. Dr. Geideman *Page 7 
recommended nerve conduction studies. At that point, Plaintiff was still restricted to work that required only limited standing and walking.
15. On October 5, 2009, Plaintiff came under the care of Dr. W. Hodges Davis at OrthoCarolina. Dr. Davis ordered x-rays, the results of which revealed an irregularity at the dorsal aspect of the first MP joint in the foot. According to Dr. Davis, the November 2008 MRI showed some edema at the same location (first MP joint). Dr. Davis recommended an injection in the joint for diagnostic purposes, and stated that if the injection provided relief, Plaintiff would most likely benefit from a great toe arthroscopy. Dr. Davis was of the opinion that Plaintiff was unable to work in any capacity as of October 5, 2009.
16. On April 8, 2010, Plaintiff underwent surgery for hallux rigidus correction with debridement and capsular release of the first metatarsophalangeal joint. Dr. Davis recommended that Plaintiff remain out of work at least until May 26, 2010, at which point she would be evaluated for possible return to light duty work.
17. Defendants initially denied this claim on a Form 61 dated March 25, 2009. However, on February 17, 2010, Defendants admitted liability on a Form 60 but noted on the form that there was "no lost time reported as of yet."
18. From January 2009 to April 2009, Plaintiff looked for work within the restrictions assigned by Dr. Geideman. She generally put in two applications a week, or made one inquiry and filed one application.
19. In April 2009, Plaintiff applied for unemployment benefits. In conjunction with her application for benefits, she applied for or inquired about at least two jobs a week. Plaintiff was paid unemployment benefits from April 2009 to October 2009, when she came under the care of Dr. Davis and he took her out of work altogether. *Page 8 
20. Plaintiff has a ninth grade education and has never performed clerical work. Prior to going to work for Defendant-Employer, Plaintiff operated a bingo parlor and worked in various manufacturing facilities as an assembly-line worker. Therefore, when she was looking for work in 2009, she focused primarily on the manufacturing facilities in and around Conover, North Carolina, hoping to get an assembly-line job that would allow her to sit down as needed.
21. Plaintiff made reasonable efforts to find employment within the restrictions assigned by Dr. Geideman after her employment with Defendant-Employer was terminated.
22. On October 5, 2009, Plaintiff became physically incapable, as a result of the October 29, 2008 injury, to earn any wages in any employment.
23. As of the date of the hearing before Deputy Commissioner Ledford, Plaintiff had not regained the capacity to earn the same wages she was earning at the time of the injury in the same or any other employment.
24. Plaintiff had not yet reached maximum medical improvement when this case was heard before Deputy Commissioner Ledford in May 2010.
25. Defendants did not present sufficient competent medical evidence to support a finding that the low back and hip pain Plaintiff began experiencing in January 2009 was not causally related to the alteration of gait pattern Plaintiff experienced as a result of the October 29, 2008 injury.
26. The position Defendant-Employer offered Plaintiff at the thrift store after her injury was a make-work job that is typically performed by volunteers. There is no evidence that the position Defendant-Employer offered Plaintiff at the thrift store is ordinarily available in the competitive job market at a wage comparable to that Defendant-Employer was paying Plaintiff. *Page 9 
27. Assuming, arguendo, that Plaintiff's employment with Defendant-Employer was terminated for misconduct unrelated to her injury, Plaintiff did not constructively refuse suitable employment because the only job Defendant-Employer had available for Plaintiff was not suitable in that it did not reflect her ability to earn wages in the competitive job market.
28. The parties entered into a stipulation prior to the hearing that Plaintiff's average weekly wage would be $495.00, unless Defendants presented a Form 22 that resulted in a different average weekly wage. Defendants never provided a properly-completed Form 22.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On October 29, 2008, Plaintiff sustained an injury by accident arising out of and in the course of her employment with Defendant-Employer, resulting in injuries to her left knee, left ankle, and left foot. N.C. Gen. Stat. § 97-2(6).
2. Because Defendants admitted liability for Plaintiff's October 29, 2008 injury on a Form 60, Plaintiff is entitled to a presumption that the medical treatment she received following the injury is causally related to the compensable injury.Parsons v. Pantry, Inc.,126 N.C. App. 540, 485 S.E.2d 867 (1997) andPerez v. Am. Airlines/AMR Corp.,174 N.C. App. 128, 620 S.E.2d 288 (2005). Because Defendants failed to rebut the presumption that the treatment Plaintiff received for the low back was causally related to the injury she sustained to her left foot, which was causing distally-radiating pain to her back and hip, Defendants shall pay all bills Plaintiff incurred for treatment of her left lower extremity and low back. N.C. Gen. Stat. §§ 97-2(19) and 97-25. *Page 10 
3. An injured employee is not entitled to compensation if he unjustifiably "refuses employment procured for him suitable to his capacity." N.C. Gen. Stat. § 97-32. Suitable employment is defined as "any job that a claimant is capable of performing considering his age, education, physical limitations, vocational skills, and experience." Shah v. Howard Johnson,140 N.C. App. 58, 68, 535 S.E.2d 577, 583 (2000) (quotingBurwell v. Winn-Dixie Raleigh,114 N.C. App. 69, 73, 441 S.E.2d 145, 149 (1994)).
4. In order for the proffered position to constitute suitable employment, it must accurately reflect the claimant's ability to earn wages in the open market. If there is "no evidence that employers, other than defendant, would hire plaintiff to do a similar job at a comparable wage," the proffered position cannot be considered suitable employment. See Saums v. Raleigh CommunityHospital, 346 N.C. 760, 487 S.E.2d 746 (1997), and Smith v.Sealed Air Corp., 127 N.C. App. 359, 489 S.E.2d 445 (1997);see, also, Wynn v. United Health Services,___ N.C. App ___, ___ S.E.2d ___ (2011), wherein the Court of Appeals held that the same standards apply in determining suitability pre-MMI as those that apply after the claimant reaches maximum medical improvement.
5. The burden is on the employer to prove that the employee refused suitable employment. Gordon v. City of Durham,153 N.C. App. 782, 571 S.E.2d 48 (2002).
6. Because Defendants failed to prove that the position in the thrift shop accurately reflected Plaintiff's ability to earn wages in the open market or that other employers would hire Plaintiff to do a similar job at a comparable wage, they failed to carry their burden of proving that Plaintiff refused suitable employment. Therefore, regardless of whether Plaintiff's employment was terminated for misconduct unrelated to the compensable injury, Plaintiff did *Page 11 
not refuse suitable employment, constructively or otherwise, and the provisions of N.C. Gen. Stat. § 97-32 do not apply.
7. Plaintiff has the burden of showing she is unable to earn the same wages she earned before the injury, either in the same employment or in other employment. Hilliard v. Apex CabinetCo., 305 N.C. 593, 290 S.E.2d 682 (1982). She can meet this burden in one of four ways: (1) the production of medical evidence that she is physically or mentally, as a consequence of the injury, incapable of any employment; (2) the production of evidence that she is capable of some work, but that she has, after a reasonable effort on her part, been unsuccessful in obtaining employment; (3) the production of evidence that she is capable of some work but that it would be futile to seek other employment because of preexisting conditions, i.e., age, inexperience, lack of education; or (4) the production of evidence that she has obtained other employment at a wage less than that earned prior to the injury. Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
8. Plaintiff proved that she was totally disabled for the period from November 14, 2008 to October 5, 2009 under the second prong ofRussell, i.e., by proving that she was unsuccessful in obtaining other employment despite reasonable effort on her part. Plaintiff is therefore entitled to benefits pursuant to N.C. Gen. Stat. § 97-29 from November 14, 2008 to October 5, 2009.
9. Beginning October 5, 2009, Plaintiff proved disability under the first prong of Russell, i.e., by presenting medical evidence from Dr. Davis that she was physically incapable of any employment, thereby entitling her to benefits pursuant to N.C. Gen. Stat. § 97-29 from October 5, 2009 to the present and continuing until she returns to work or further order of the Industrial Commission. *Page 12 
10. "Stipulations are judicial admissions and are therefore binding in every sense. . . ." Thomas v. Poole,54 N.C. App. 239, 241, 282 S.E.2d 515, 517 (1981), cert.denied, 304 N.C. 733, 287 S.E.2d 902 (1982). Defendants are bound by their stipulation as to the average weekly wage. Therefore, because Defendants failed to produce a Form 22 wage chart, Plaintiff's average weekly wage is $495.00, which generates a compensation rate of $330.02.
11. Defendants are entitled to a week to week credit for the gross unemployment benefits Plaintiff received in 2009. N.C. Gen. Stat. § 97-42.1.
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay Plaintiff temporary total disability benefits at the rate of $330.02 per week, from November 14, 2008 to the present and continuing until further order of the Industrial Commission, subject to a week-to-week credit for the gross unemployment benefits Plaintiff was paid in 2009 as well as a credit for the temporary total disability benefits that have already been paid. That compensation which has accrued shall be paid to Plaintiff in a lump sum, subject to the attorney fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by Plaintiff for treatment of the involved injury, including expenses incurred for treatment of the low back and hip, when bills for the same have been submitted to and approved by the Industrial Commission, or otherwise submitted to Defendants for payment on proper forms.
3. A reasonable attorney's fee of twenty-five percent is hereby approved for Plaintiff's counsel and shall be calculated based upon the net amount due Plaintiff after *Page 13 
Defendants have taken their credit. This amount shall be deducted from the lump sum due Plaintiff and forwarded directly to Plaintiff's counsel. Thereafter, every fourth compensation check shall be forwarded directly to Plaintiff's counsel for the balance of his fee.
4. Defendants shall pay the costs.
This the __ day of September, 2011.
 S/___________________ TAMMY R. NANCE COMMISSIONER
CONCURRING:
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER